UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY OCAMPO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>HEITECH SERVICES, INC.,<br><br>　　　　Defendant. | Case No. 19-cv-04176-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 39 |

Plaintiff Henry Ocampo filed the instant action against Defendant HeiTech Services, Inc., alleging that his employment was terminated due to disability discrimination. (Compl. ¶ 2, Dkt. No. 1-2.) Pending before the Court is Defendant's motion for summary judgment. (Def.'s Mot. for Summ. J., Dkt. No. 39.)

The Court previously deemed this matter suitable for disposition without a hearing pursuant to Civil Local Rule 7-1(b), and vacated the August 6, 2020 hearing. (Dkt. No. 46.) Having considered the parties' filings and relevant legal authority, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.

## I.   BACKGROUND

Defendant "is a federal programs and technology solutions provider." (Hackett Decl. ¶ 2, Dkt. No. 39-2.) In 2008, Defendant "was awarded a federal contract ('the OMHRC Contract') to implement various goals set out by the U.S. Department of Health and Human Service's Office of Minority Health ('OMH') relating to improving the health of racial and ethnic minorities through the development of health policies and programs." (Hackett Decl. ¶ 3.) The OMHRC Contract is renewed every five years, and the budget for the OMHRC contract is renewed each year through option agreements. (Goddard Decl. ¶ 3, Dkt. No. 39-3.)

On October 1, 2008, Plaintiff was hired by Defendant as a Capacity Building Specialist under the OMHRC Contract. (Ocampo Dep. at 29:20-30:8, Dkt. No. 39-7; Hackett Decl. ¶ 4; Goddard Decl. ¶ 4.) Plaintiff's job duties included "capacity building," helping organizations with organizational development, staffing, financial/operational planning, and grant writing. (Ocampo Dep. at 36:7-21, Exh. 4; Hackett Decl. ¶ 4.) Plaintiff was responsible for Region 9, covering Hawaii, California, Nevada, Arizona, and the U.S. Pacific Islands. (Ocampo Dep. at 53:24-54:16.) Plaintiff's work was focused on minority health issues for Pacific Islanders. (Hackett Decl. ¶ 4; Ocampo Dep., Exh. 4.) Plaintiff's work included traveling to the Pacific Islands, although during the last few years of his employment, Plaintiff would only travel to the Pacific Islands about once a year if it was approved. (Hackett Decl. ¶ 4; Ocampo Dep. 57:20-23.) The OMHRC Contract for September 27, 2017 through September 26, 2018 included a Secretary Minority AIDS Initiative ("SMAIF"), which funded 50% of Plaintiff's position. (Goddard Decl. ¶ 4.)

On July 25, 2018, Plaintiff requested leave under the Family Medical Leave Act ("FMLA") for thirty days, starting July 30, 2018. (Hackett Decl. ¶ 5.) Plaintiff took leave due to high-level stress, anxiety, increasing blood pressure, and insomnia. (Ocampo Dep. at 101:19-25.) After Plaintiff started waking up screaming, Plaintiff's doctor placed him on medical leave. (Ocampo Dep. at 101:25-102:5.) Plaintiff spoke with his supervisor and Human Resources ("HR") regarding the need for leave. (Ocampo Dep. at 69:9-70:25.) Plaintiff described his supervisor and HR as being supportive and professional, and that his supervisor did not pry into the specifics of why he required leave. (Ocampo Dep. at 70:12-71:16, 81:10-16.)

In August 2018, the OMHRC Contract was re-negotiated by OMH, effective September 27, 2018 through March 26, 2019 ("9/27/2018 OMHRC Contract"). (Goddard Decl. ¶ 6; 9/27/2018 OMHRC Contract at HEITECH 000284, Dkt. No. 47-3.) The 9/27/2018 OMHRC Contract had a reduced budget, with a six-month budget of $1.064 million, a $726,000 decrease. (Goddard Decl. ¶ 6.) The 9/7/2018 OMHRC Contract also reduced the travel budget to $20,000. (Goddard Decl. ¶ 9.) The 9/27/2018 OMHRC Contract's stated scope included capacity development and technical assistance services to organizations "in the US, US-associated Pacific jurisdictions and US territories." (9/27/2018 OMHRC Contract at HEITECH 000301.) The

9/27/2018 OMHRC Contract, however, specifically eliminated all AIDS/HIV outreach to the Pacific Islands and activities associated with the SMAIF grant. (Goddard Decl. ¶ 6; 9/27/2018 OMHRC Contract at HEITECH 000301, 000305-10.) The 9/27/2018 OMHRC Contract was signed on October 2, 2018. (*See* Dkt. No. 47-1.)

After reviewing the 9/27/2018 OMHRC Contract, Anna Goddard, Defendant's Vice President of Operations, determined that Defendant could not keep Plaintiff employed "because his job duties were eliminated, and the budget for those duties were likewise eliminated." (Goddard Decl. ¶ 7.) Ms. Goddard also determined that the reduced travel budget meant "it was no longer an option for Plaintiff to travel to the Pacific Islands . . . ." (Goddard Decl. ¶ 9.) Ms. Goddard thus concluded that Plaintiff's employment would need to end on September 26, 2018, the end of the then-current contract period. (Goddard Decl. ¶ 7.) Ms. Goddard consulted with Craig Hackett, Defendant's Chief Human Capital Officer regarding the termination. (Goddard Decl. ¶ 7; Hackett Decl. ¶ 7.)

Plaintiff returned from leave on August 31, 2018. (Hackett Decl. ¶ 5.) Plaintiff then took a two-week vacation, which had been scheduled two months prior to Plaintiff's medical leave. (Hackett Decl. ¶ 5; Ocampo Dep at 114:6-13.) Plaintiff returned to work on September 14, 2018. (Ocampo Dep. at 86:18-25.) Upon his return, Plaintiff provided a note from his medical provider, stating that he could return to work with no limitations. (Ocampo Dep. 84:25-85:4, Exh. 19.) That same day, Plaintiff was informed that his employment would be terminated in two weeks. (Ocampo Dep. at 86:22-87:4.) Prior to his termination, Plaintiff had never been disciplined, and was satisfactorily performing his job duties. (Pl.'s Opp'n, Exh. 3 at 8:24-9:7; Exh. 4 at 6:5-14, Dkt. No. 41.)

Defendant has not hired anyone to do Plaintiff's work, and no other employee assumed Plaintiff's duties. (Hackett Decl. ¶ 8.) Defendant also asserts that in September 2018, no other positions were available for Plaintiff to transfer to because all other Senior Program Analyst positions required the employees to be associated with the communities they worked with, and to have established contacts within those communities. (Hackett Decl. ¶ 9.) As of 2020, all Senior Program Analyst positions were eliminated due to OMH continuing to reduce outreach programs

and budgeting through the OMHRC Contract.  (Hackett Decl. ¶ 10.)

Plaintiff filed the instant action, asserting claims for: (1) disability discrimination in violation of the Fair Employment and Housing Act ("FEHA"), (2) retaliation in violation of FEHA, (3) retaliation in violation of the Family Medical Leave Act and California Family Rights Act, (4) failure to prevent discrimination and retaliation in violation of FEHA, and (5) wrongful termination in violation of public policy.[1]  (Compl. at 1.)  On July 2, 2020, Defendant filed the instant motion for summary judgment.  On July 16, 2020, Plaintiff filed his opposition.  (Pl.'s Opp'n, Dkt. No. 41.)  On July 23, 2020, Defendant filed its reply.  (Def.'s Reply, Dkt. No. 44.)

## II.   LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) by "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to

---

[1] Plaintiff also brought a claim for waiting time penalties, which was resolved by the parties as of April 22, 2020.  (Dkt. No. 33.)

4

discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.   DISCUSSION

**A.   First Claim: Discrimination under the Fair Employment and Housing Act**

Per FEHA, "it is unlawful to discriminate against an employee on the basis of 'physical disability.'" *Cornell v. Berkeley Tennis Club*, 18 Cal. App. 5th 908, 925 (2017) (quoting Cal. Gov. Code § 12940(a)). Plaintiff's disability discrimination claim is subject to the *McDonnell Douglas* burden-shifting analysis. *Id.*; *see also King v. United Parcel Serv., Inc.*, 152 Cal. App. 4th 426, 432 n.2 (2007)). Plaintiff first has the burden of establishing a prima facie case of discrimination by showing that he: "(1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations; and (3) was subjected to an adverse employment action because of the disability or perceived disability." *Cornell*, 18 Cal. App. 5th at 926 (internal quotation omitted).

1  Once Plaintiff establishes a prima facie case, the burden shifts to Defendant "to produce
2  admissible evidence that the adverse employment action was taken for a legitimate,
3  nondiscriminatory reason." *King*, 152 Cal. App. 4th at 432 n.2.  If Defendant does so, the burden
4  shifts back to Plaintiff to demonstrate that Defendant's reason is pretextual.  *Id.* at 433.  At the
5  summary judgment stage, Plaintiff must "present specific and substantial responsive evidence that
6  the employer's evidence was in fact insufficient or that there is a triable issue of fact material to
7  the employer's motive."  *Id.*

### i. Prima Facie Case

Defendant argues Plaintiff cannot establish a prima facie case of disability discrimination because Plaintiff was not disabled.[2]  (Def.'s Mot. for Summ. J. at 18.)  Defendant contends Plaintiff's disability was "a temporary period of stress and anxiety preventing him from working." (*Id.*)  In support, Defendant points to Plaintiff's return from leave without any restrictions.  (*Id.*) Thus, Defendant concludes that Plaintiff was not disabled at the time of his termination.  (*Id.*) Plaintiff responds that he was disabled, as his stress, anxiety, increasing blood pressure, and insomnia limited his ability to sleep and work.  (Pl.'s Opp'n at 8.)  Defendant does not dispute this in its reply.

The Court finds Plaintiff has adequately established that he was disabled.  The fact that he could return to work without restrictions does not mean Plaintiff did not continue to suffer from stress, anxiety, increasing blood pressure, and insomnia.  Rather, it simply means Plaintiff did not require an accommodation for his disabilities at the time of his return from leave.

### ii. Legitimate, Non-Discriminatory Reason

Defendant's primary argument is that summary judgment is warranted because it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment, namely that "the OMH eliminated Plaintiff's job duties of outreach to the Pacific islands, and the budget for those duties."  (Def.'s Mot. for Summ. J. at 18.)  Plaintiff argues that this reason is pretextual.  (Pl.'s Opp'n at 9.)

---

[2] Defendant does not challenge the other two prongs of a prima facie case.  (*See* Def.'s Mot. for Summ. J. at 18.)

1  As an initial matter, Plaintiff argues that his termination occurred before the 9/27/2018 OMHRC Contract was signed on October 2, 2018, and that a jury could find that his termination before the purported contractual modification was not the reason for his termination.  (Pl.'s Opp'n at 10.)  The Court disagrees.  Even if the 9/27/2018 OMHRC Contract was signed on October 2, 2018, there is no dispute that it was re-negotiated in August 2018 and went into effect on September 27, 2018.  (*See* Goddard Decl. ¶ 6.)  Moreover, there is no suggestion that the 9/27/2018 OMHRC Contract terms were subject to further change, such that Plaintiff's position might not be affected.  In short, regardless of when the 9/27/2018 OMHRC Contract was actually signed, there is no evidence in the record to suggest that Defendant believed the 9/27/2018 OMHRC Contract terms would not go into effect when it made the decision to terminate Plaintiff.

The Court, however, agrees with Plaintiff that there is a dispute as to whether the 9/27/2018 OMHRC Contract in fact eliminated Plaintiff's job duties and funding for his position.  With respect to the job duties, there is no dispute that Plaintiff's HIV/AIDS-related duties were eliminated by the 9/27/2018 OMHRC Contract.  (*See* Pl.'s Opp'n at 12.)  Defendant, however, argues that Plaintiff's job duties were "**entirely** eliminated" by the 9/27/2018 OMHRC Contract, including his capacity building duties.  (Def.'s Mot. for Summ. J. at 19 (emphasis added); *see also* Goddard Decl. ¶ 7.)  As Plaintiff points out, the 9/27/2018 OMHRC Contract still required Defendant to "conduct a program of capacity development and technical assistance services, education and information dissemination" to organizations serving "racial and ethnic minority communities in the US, US-associated **Pacific** jurisdictions and US territories."  (9/27/2018 OMHRC Contract ¶ 2.1.7.1 (emphasis added).)  The 9/27/2018 OMHRC Contract also required technical assistance for institutions including "Asian American Native American **Pacific Islander** Serving Institutions."  (9/27/2018 OMHRC Contract ¶ 2.1.7.2.1 (emphasis added).)  Likewise, the 9/27/2018 OMHRC Contract required Defendant to conduct outreach and promotion activities in the US, US-associated Pacific jurisdictions and US territories."  (9/27/2018 OMHRC Contract ¶ 2.1.8.1.)  In short, these terms appear to still require that Defendant provide capacity development and outreach in the U.S. Pacific Island regions, which were duties assigned to Plaintiff.

In response, Defendant points to Plaintiff's declaration that the 9/27/2018 OMHRC

7

1  Contract eliminated Plaintiff's job duties.  (Def.'s Reply at 6; Goddard Decl. ¶ 7.)  Ms. Goddard,
2  however, does not explain the discrepancy with the 9/27/2018 OMHRC Contract terms requiring
3  capacity development and outreach in the Pacific Islands or for Pacific Islander-serving
4  organizations.

5  Similarly, there is a dispute as to whether the 9/27/2018 OMHRC Contract actually
6  eliminated funding for Plaintiff's position.[3]  Again, Defendant asserts that funding for Plaintiff's
7  position was "entirely eliminated" by the 9/27/2018 OMHRC Contract, such that "there was no
8  funding for Plaintiff's position."  (Def.'s Mot. for Summ. J. at 19.)  Plaintiff presents evidence that
9  the 9/27/2018 OMHRC Contract "did not contain any provision providing for the allocation of
10 funding to specific minority groups—instead, it was within [Defendant]'s discretion to allocate
11 funding."  (Pl.'s Opp'n at 13.)  Specifically, Plaintiff points to Mr. Hackett's deposition testimony,
12 where he agreed that the 9/27/2018 OMHRC Contract "d[id no]t contain any provisions providing
13 for the allocation of funding to specific minority groups."  (Hackett Dep. at 42:16-43:3, Dkt. No.
14 55-1.)  Mr. Hackett also agreed that it was "within [Defendant]'s discretion . . . to allocate the
15 funding."  (Hackett Dep. at 43:4-9.)  This evidence creates a dispute as to whether the 9/27/2018
16 OMHRC Contract eliminated funding for Plaintiff's position, or if the 9/27/2018 OMHRC
17 Contract simply gave *Defendant* discretion to eliminate the funding for Plaintiff's position.

18 Further, Plaintiff points to Mr. Elton Naswood, another Senior Program Analyst whose
19 HIV/AIDS work was also eliminated by the 9/27/2018 OMHRC Contract, but whose employment
20 was not terminated.  (Pl.'s Opp'n at 12-13.)  Plaintiff contends that given Mr. Naswood's position
21 was not terminated, the comparable elimination of Plaintiff's HIV/AIDS work and its budget "did
22 not necessitate the termination of Plaintiff."  (*Id.* at 13.)  Defendant argues that Mr. Naswood had

---

[3] Plaintiff objects to Ms. Goddard's declaration regarding the terms of the prior OMHRC Contract, arguing that per Federal Rule of Evidence 1002, the prior OMHRC Contract must be produced to prove its contents.  (Pl.'s Opp'n at 10-11.)  The Court disagrees.  At issue is what the prior budget was, not what the prior OMHRC Contract stated the budget was.  As the Vice President of Operations, and the person in charge of implementing the OMHRC Contracts, Ms. Goddard has personal knowledge of what the budget was and from where the money came.  Ms. Goddard would also have personal knowledge of how the budget was affected by the 9/27/2018 OMHRC Contract, including whether it was decreased from prior contracts.  Accordingly, the Court OVERRULES Plaintiff's objection.

other job duties. (Def.'s Reply at 6.) As discussed above, again, Plaintiff likewise had other job duties which did not appear to be eliminated based on the contractual language. A jury could thus find that given Mr. Naswood was not terminated despite a comparable reduction of duties, Defendant's reasons for terminating Plaintiff were pretextual.

Accordingly, considering the evidence in the light most favorable to Plaintiff, the Court finds there is a dispute of material fact as to whether the 9/27/2018 OMHRC Contract eliminated all of Plaintiff's job duties and funding for his position. Thus, Plaintiff has satisfied his burden of showing that Defendant's stated reason for his termination was pretextual. Accordingly, the Court DENIES summary judgment as to Plaintiff's FEHA claim for discrimination.

### B. Remaining Claims

As to Plaintiff's remaining claims, Defendant relies on its assertion that there was a legitimate, non-discriminatory reason for terminating Plaintiff's position. (*See* Def.'s Mot. for Summ. J. at 21 ("Even if Plaintiff's request for medical leave and subsequent termination support a *prima facie* case of retaliation, [Defendant] had a legitimate, non-discriminatory reason for terminating his employment give the changes to the OMHRC Contract"), 23 ("Plaintiff's retaliation claim under CFRA fails for the same reason as his retaliation claim under FEHA"), 24 ("Plaintiff's cause of action relies on the other discrimination claims and retaliation, and this claim fails for the same reason as those claims"), 25 ("Because [Plaintiff]'s discrimination and retaliation claims under FEHA, FMLA, and CFRA fail, he cannot pursue a derivative wrongful termination claim."). Because there is a dispute as to whether Defendant's stated reason for Plaintiff's termination was legitimate and non-discriminatory or pretextual, the Court DENIES summary judgment as to Plaintiff's remaining claims.

### C. Punitive Damages

Finally, Defendant argues that Plaintiff's prayer for punitive damages fails because Plaintiff cannot satisfy California Code of Civil Procedure § 3294. (Def.'s Mot. for Summ. J. at 25-26.) Section 3294(b) permits punitive damages against a corporate employer only where there is an "act of oppression, fraud, or malice . . . on the part of an officer, director, or managing agent of the corporation."

1  Defendant contends that Plaintiff cannot identify a managing agent who took action
2  against him.  (Def.'s Mot. for Summ. J. at 25.)  A managing agent must "be more than a mere
3  supervisory employee."  *White v. Ultramar*, 21 Cal. 4th 563, 573 (1999).  Instead, "[t]he managing
4  agent must be someone who exercises substantial discretionary authority over decisions that
5  ultimately determine corporate policy."  *Id.*  "[B]y selecting the term 'managing agent,' and
6  placing it in the same category as 'officer' and 'director,' the Legislature intended to limit the
7  class of employees whose exercise of discretion could result in a corporate employer's liability for
8  punitive damages."  *Id.*  Thus, "supervisors who have no discretionary authority over decisions
9  that ultimately determine corporate policy would not be considered managing agents even though
10 they may have the ability to hire or fire other employees."  *Id.* at 577.

Plaintiff responds that Mr. Hackett is an officer because he is the Chief Human Capital Officer who "oversees the Human Resources Department and works with the department on *all* employee hirings and terminations."  (Pl.'s Opp'n at 17.)  Plaintiff, however, presents no evidence that Mr. Hackett "exercise[d] substantial discretionary authority over decisions that ultimately determine corporate policy."  *White*, 21 Cal. 4th at 573.  For example, Plaintiff points to no evidence that Mr. Hackett sets policy, as opposed to applying policies.  Plaintiff also provides no evidence that Mr. Hackett had discretion over personnel decisions, rather than assisting with the logistics and process of hiring and terminating employees.  In short, Plaintiff has not identified any evidence in the record that suggests Mr. Hackett "exercised (or had the ability to exercise) substantial discretionary authority over decisions that ultimately determined corporate policy in some aspect of Defendant's business."  *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 932 (E.D. Cal. 2013); *see also Shepherd v. Kohl's Dep't Stores*, Civil No. 14-cv-1901-DAD-BAM, 2016 U.S. Dist. LEXIS 101279, at *38-39 (E.D. Cal. Aug. 2, 2016) (finding that a HR Director was not a managing agent because although the HR Director "was one of several people from whom approval was sought prior to a decision to terminate an employee[, i]t says nothing about [the HR Director]'s role in determining corporate policy"); *Baird v. Office Depot*, Case No. 12-cv-6316-EMC, 2014 U.S. Dist. LEXIS 77494, at *29-30 (N.D. Cal. June 4, 2014) (finding that although an individual "may have taken some part in the hiring and promotion at the store, this

10

does not demonstrate that he was an officer, director, or managing agent who could determine 'corporate policy'"); *Rabara v. Heartland Empl. Servs., LLC*, Case No. 17-cv-3770-LHK, 2019 U.S. Dist. LEXIS 71170, at *86-87 (N.D. Cal. Apr. 26, 2019) (finding that assistant directors and a HR director were not managing agents because there was no evidence that they had discretion over corporate policy).

Additionally, Defendant argues that there is no evidence that Defendant's employees acted with malice, oppression, or fraud in terminating Plaintiff. (Def.'s Mot. for Summ. J. at 26.) Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civil Code § 3294(c)(1). Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civil Code § 3294(c)(2). Despicable conduct, in turn, "is conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Scott v. Phoenix Schools, Inc.*, 175 Cal. App. 4th 702, 715 (2009) (internal quotation omitted). Finally, fraud is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person or property or legal rights or otherwise causing injury." Cal. Civil Code § 3294(c)(3).

Plaintiff contends that a jury could find malice, oppression, and/or fraud because he was terminated for taking a medical leave of absence, and Defendant's reason for the termination was pretextual. (Pl.'s Opp'n at 17-18.) Notably, Plaintiff cites no action taken specifically by Mr. Hackett; there is not even evidence that Mr. Hackett's approval was needed for Plaintiff's termination. Moreover, an unlawful termination, without more, is insufficient. In general, "[p]unitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." *Scott*, 175 Cal. App. 4th at 716. Thus, "[s]omething more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a

conscious and deliberate disregard of the interests of others that his conduct may be called willful or wanton." *Id.* (internal quotation omitted). Accordingly, punitive damages are not warranted where "[t]he only evidence of wrongful conduct directed towards [the plaintiff] was her termination for an improper reason." *Id.*; *see also Rabara*, 2019 U.S. Dist. LEXIS 71170, at *9 (granting the employer's motion for summary judgment where the plaintiff failed to allege any malice, oppression, of fraudulent behavior other than the allegedly wrongful termination).

Plaintiff cites to *Huber v. Standard Insurance Co.*, 841 F.2d 980 (9th Cir. 1988), for the proposition that "[e]vidence that an employer terminates an employee without cause, presents pretextual reasons for discharge, combined with evidence of an illegal motive for termination, may be sufficient to raise genuine issues of material fact as to whether punitive damages are proper." (Pl.'s Opp'n at 17.) *Huber*, however, involved far more than termination without cause and pretextual reasons for the termination. There, the plaintiff was terminated for having a negative attitude and criticizing his employer's product, although the plaintiff had never been informed of any dissatisfaction with his performance and had never expressed unhappiness about the product. 841 F.2d at 982. The employer then memorialized in a letter, the damaging pretextual reasons for discharge, refused to allow the plaintiff's pension to vest despite a standard practice of allowing terminated managers to stay on until their pensions vested, and requested the plaintiff's immediate removal from his office. *Id.* at 987. The Ninth Circuit found that these facts, combined with evidence that retaliation was the motive for termination, raised a genuine issue of material fact as to whether punitive damages were proper. *Id.*; *see also King v. AC & R Adver.*, 65 F.3d 764, 770 (9th Cir. 1995) (describing *Huber* facts as "outrageous").

Here, in contrast, while there is a genuine dispute of material fact as to whether Defendant's reasons for terminating Plaintiff are pretextual, it does not rise to nearly the same level of *Huber*. Defendant did not give *damaging* pretextual reasons for terminating Plaintiff, nor did it take other actions that suggest malice, oppression, or fraud. Plaintiff cites no facts that would raise Defendant's actions to the extreme levels that would warrant punitive damages; indeed, Plaintiff testified that he never felt that anyone did or said anything that he believed was motivated by his disability or his need for medical leave. (*See* Ocampo Dep. at 120:17-121:5.)

12

Plaintiff fails to set forth any specific facts showing that there is a genuine issue for trial as to whether Mr. Hackett is an officer, director, or managing agent, as well as whether there was malice, oppression, or fraudulent behavior by Mr. Hackett or any other individual in Defendant's employ. Accordingly, the Court GRANTS Defendant's motion for summary judgment as to punitive damages.

## IV. CONCLUSION

For the reasons stated above, the Court DENIES Defendant's motion for summary judgment as to Plaintiff's causes of action. The Court GRANTS Defendant's motion for summary judgment as to Plaintiff's prayer for punitive damages.

In light of the ongoing COVID-19 public health emergency, it is highly unlikely the November 2, 2020 jury trial will proceed. Accordingly, the Court SETS a case management conference for **September 29, 2020** at 1:30 p.m. An updated joint case management conference statement is due on September 22, 2020.

IT IS SO ORDERED.

Dated: September 16, 2020

KANDIS A. WESTMORE
United States Magistrate Judge

13